## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

(1)  SELECT ENERGY SERVICES, INC., a Delaware corporation;
(2)  SELECT ENERGY SERVICES, LLC, a Delaware limited liability company; and
(3)  CRESCENT SERVICES, LLC, an Oklahoma limited liability company,

Plaintiffs,

vs.

(1)  MAMMOTH ENERGY SERVICES, INC., a Delaware Corporation;
(2)  AQUAHAWK ENERGY, LLC, a Delaware limited liability company;
(3)  ERIC TODD MCDONALD, an individual;
(4)  KEVIN SCOTT PACK, an individual;
(5)  RYAN BRUCE STOVER, an individual, and
(6)  KEVIN CARR, an individual,

Defendants.

Case No. CIV-19-28-R

## <u>COMPLAINT</u>

Plaintiffs, Select Energy Services, Inc. ("<u>Select</u>"); Select Energy Services, LLC ("<u>SES LLC</u>"); and Crescent Services, LLC ("<u>Crescent Services</u>") (together, the "<u>Select Parties</u>"), for their claims for relief against Defendants, Mammoth Energy Services, Inc. ("<u>Mammoth</u>"); Aquahawk Energy, LLC ("<u>Aquahawk</u>"); Eric Todd McDonald; Kevin Scott Pack; Ryan Bruce Stover; and Kevin Carr (McDonald, Pack, Stover and Carr together, the "<u>Former Employees</u>") (Mammoth, Aquahawk, and the Former Employees

together, the "Mammoth Parties"), hereby allege and state as follows.

## PARTIES, JURISDICTION & VENUE

1.      Select is a publicly traded Delaware corporation with its principal place of business in Houston, Texas.

2.      SES LLC is a Delaware limited liability company. Select is the indirect parent of SES LLC.

3.      Crescent Services is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma. Select is the indirect parent of Crescent Services.

4.      The Select Parties provide end-to-end water management solutions to oil and gas producers in Oklahoma and other states.

5.      Mammoth is a publicly traded Delaware corporation with is principal place of business in Oklahoma City, Oklahoma.

6.      Aquahawk is a Delaware limited liability company with its principal place of business in Oklahoma City, Oklahoma. Upon information and belief, Mammoth is the direct or indirect parent company of Aquahawk.

7.      Eric Todd McDonald is a resident and citizen of the State of Oklahoma.

8.      Kevin Scott Pack is a resident and citizen of the State of Oklahoma.

9.      Ryan Bruce Stover is a resident and citizen of the State of Oklahoma.

10.     Kevin Carr is a resident and citizen of the State of Oklahoma.

11.     McDonald and Pack were employed by the Select Parties and worked out of the Select Parties' Chickasha, Oklahoma yard. Stover was employed by the Select

Parties and worked out of the Select Parties' Oklahoma City, Oklahoma office. Carr was employed by the Select Parties and worked out of the Springer, Oklahoma yard.

12.    While employed by the Select Parties, McDonald worked as a Water Transfer Foreman.

13.    While employed by the Select Parties, Pack worked as a District Manager.

14.    While employed by the Select Parties, Stover worked as Vice President of Water Solutions.

15.    While employed by the Select Parties, Kevin Carr worked as a District Manager.

16.    On January 12, 2014, McDonald entered into that certain "Employment Agreement" with Crescent Services (the "McDonald Employment Agreement"). A true and correct copy of the McDonald Employment Agreement, effective January 12, 2014, is attached to this Complaint. *See* Exhibit 1, McDonald Employment Agreement.

17.    On January 28, 2014, Carr entered into that certain "Confidentiality and Non-Solicitation Agreement" with Rockwater Energy Solutions, Inc. (the "Carr Agreement"). A true and correct copy of the Carr Agreement, effective February 28, 2014, is attached to this Complaint. *See* Exhibit 6, Carr Agreement.

18.    On October 1, 2015, Pack entered into that certain "Employment Agreement" with Crescent Services (the "Pack Employment Agreement"). A true and correct copy of the Pack Employment Agreement, effective October 1, 2015, is attached to this Complaint. *See* Exhibit 2, Pack Employment Agreement.

19.    Effective March 31, 2016, Stover entered into a contract entitled "Amended

3

and Restated Employment Agreement" with Crescent Services (the "Stover Employment Agreement"). A true and correct copy of the Stover Employment Agreement, effective March 31, 2016, is attached to this Complaint. *See* Exhibit 3, Stover Employment Agreement.

20.     At Paragraph 11.2 of each of their Employment Agreements, McDonald, Pack, and Stover each consented to the jurisdiction of and venue in this Court and waived any and all objections to the jurisdiction of or venue in this Court.

> Forum Selection. Any state or federal court sitting in or having jurisdiction over Oklahoma County, Oklahoma, shall be the sole and exclusive courts to enforce or interpret this Agreement. Employee and the Company each unconditionally submit to the personal jurisdiction of such courts and waive any objections to venue in such courts and objections that any such court is an inconvenient forum.

(Ex. 1, McDonald Employment Agreement, ¶ 11.2, p. 5); (Ex. 2, Pack Employment Agreement, ¶ 11.2, p. 7); (Ex. 3, Stover Employment Agreement, ¶ 11.2, p. 7).

21.     In each of their Employment Agreements, McDonald, Pack, and Stover agreed that Oklahoma law will govern and control the Employment Agreements, and rights and obligations thereunder, without reference to principles of conflict of laws. (Ex. 1, McDonald Employment Agreement, ¶ 11.1, p. 5); (Ex. 2, Pack Employment Agreement, ¶ 11.1, p. 6-7); (Ex. 3, Stover Employment Agreement, ¶ 11.1, p.7).

22.     As set out above, the Court has personal jurisdiction over the Mammoth Parties. Under 28 U.S.C. § 1331, this Court has federal question jurisdiction over the Select Parties' theory of recovery arising under the federal Defend Trade Secrets Act. Under 28 U.S.C. § 1367, the Court has supplemental jurisdiction over the Select Parties'

other theories of recovery. Under 28 U.S.C. § 1391(b) and in accordance with the agreements of in the Employment Agreements, venue is proper in this Court, because a substantial part of the events giving rise to the Select Parties' cause of action occurred in this judicial district.

## CAUSE OF ACTION

23.   As mentioned above, McDonald, Pack, and Stover entered into Employment Agreements with Crescent Services for which they were paid consideration. At Paragraph 9 of their respective Employment Agreements, McDonald, Pack, and Stover agreed that, upon separation of employment from Crescent Services, they would keep information that they learned while working for Crescent Services confidential:

Confidential Information and Restrictive Covenants.

No Disclosure. During Employee's employment with the Company, and at all times thereafter, Employee agrees to hold in confidence and not disclose, directly or indirectly any and all secret, proprietary or confidential information, knowledge or data ("Confidential Information") relating to the Company, the Company's parent company, all of the Company's affiliates and subsidiaries and entities under common control with the Company, whether existing now or in the future and their respective businesses, which shall have been obtained by Employee during Employee's employment by the Company. Confidential Information includes, but is not limited to, proprietary, client or business information of the Company whether oral (whether or not thereafter described in writing) written or in a physical embodiment or otherwise, including, but not limited to, Trade Secrets (defined below) customer lists, independent contractor and employee lists, financial information, bank account numbers, pricing data, sales data, marketing data, business plans, the name, address, or telephone or facsimile number, or email address of each party's affiliates, agents, brokers, buyers, sellers, customers, distributors, suppliers, lenders or other entities related to any of the foregoing.

Exception. Notwithstanding the provisions of paragraph 9.1 above, Employee shall not be held liable for disclosure of information which was

in the public domain and is readily available to the public at the time of its disclosure by Employee through means unrelated to Employee's disclosure. (Ex. 1, McDonald Employment Agreement, ¶¶ 9.1, 9.2, p. 3); (Ex. 2, Pack Employment

Agreement, ¶¶ 9.1, 9.2, p. 5); (Ex. 3, Stover Employment Agreement, ¶¶ 9.1, 9.2, p. 5–6).

24.    At Paragraphs 8 and 9.4.3 of Defendant McDonald's and Pack's

Employment Agreements, and at ¶¶ 9.4(c), (d) of Defendant Stover's Employment

Agreement, McDonald, Pack, and Stover agreed that, upon separation of employment

from Crescent Services, they would not solicit employees or customers to leave Crescent

Services:

> <u>Duty upon Termination of Services</u>. Upon termination of Employee's employment with the Company for any reason or at any time upon request of the Company, Employee will deliver to the Company all materials of any nature, including any materials which may be stored electronically, which are in Employee's possession or control and which are or contain Confidential Information (as defined in paragraph 9.1 of this Agreement), or which are otherwise the property of the Company, including, without limitation, all customer lists, financial statements, books, keys, writings, designs, documents, records, data, memoranda, tapes and disks containing software, models, manuals, documentation, and notes. Following any termination of employment, Employee will cooperate fully with the Company in all matters relating to the winding up of pending work on behalf of the Company and the orderly transfer of work to other employees of the Company. During the period ending 12 months after the termination of Employee's employment with the Company, Employee will not solicit or induce, or attempt to solicit or induce, any person employed by, or as an agent of, the Company, to terminate his employment or agency with the Company.

(Ex. 1, McDonald Employment Agreement, ¶ 8, p. 3); (Ex. 2, Pack Employment

Agreement, ¶ 8, p. 4–5) (emphasis added).

> <u>Duty upon Termination of Services</u>. Upon termination of Employee's employment with the Company for any reason or at any time upon request of the Company, Employee will: (a) deliver to the Company all tools, equipment, information and materials, including any information or

materials which are stored electronically, which are the Company's property and which are in the Employee's possession or control, including, without limitation, any cell phone or computer, all customer lists, financial statements, books, keys, writings, designs, documents, records, data, memoranda, tapes and disks containing software, models, manuals, documentation, and notes, and (b) cooperate fully with the Company in all matters relating to the winding up of pending work on behalf of the Company and the orderly transfer of work to other employees of the Company.

(Ex. 3, Stover Employment Agreement, ¶ 8, p.5)

Restrictive Covenant. Employee agrees that he will not, by or for himself, or as an agent, representative or employee of another, except in furtherance of his duties to the Company, do as follows: …

During the Restricted Period [12-month period after date of termination with Company], directly solicit the sale of goods, services or a combination of goods and services from the established customers of the Company.

(Ex. 1, McDonald Employment Agreement, ¶ 9.4.3, p. 4); (Ex. 2, Pack Employment Agreement, ¶ 9.4.3, p. 5–6); (Ex. 3, Stover Employment Agreement, ¶ 9.4(c)).

25.     At Paragraph 9.4.4 of their respective Employment Agreements, McDonald, Pack, and Stover agreed that, upon separation of employment from Crescent Services, they would not disparage Crescent Services:

During his employment with the Company and during the Restricted Period [i.e., the 12 months after termination], engage in conduct or make statements that are derogatory about or detrimental to the Company, or any of its managers or employees.

(Ex. 1, McDonald Employment Agreement, ¶ 9.4.4., p. 4); (Ex. 2, Pack Employment Agreement, ¶ 9.4.4., p. 6); (Ex. 3, Stover Employment Agreement, ¶ 9.4(e), p. 6).

26.     In addition to the McDonald Employment Agreement, McDonald also entered into that certain "Confidentiality and Assignment Agreement," effective March

20, 2017, with Crescent Services (the "McDonald Confidentiality and Assignment Agreement"). The McDonald Confidentiality and Assignment Agreement contained restrictions on McDonald's disclosure of Crescent Services' "Confidential Information," as defined by that agreement. (Ex. 4, McDonald Confidentiality and Assignment Agreement, ¶ 3).

27.     In addition to the Pack Employment Agreement, Pack also entered into that certain "Confidentiality and Assignment Agreement," effective January 1, 2017, with Crescent Services (the "Pack Confidentiality and Assignment Agreement"). The Pack Confidentiality and Assignment Agreement contained restrictions on Pack's disclosure of Crescent Services' "Confidential Information," as defined by that agreement. (Ex. 5, Pack Confidentiality and Assignment Agreement, ¶ 3).

28.     Under the Carr Agreement, Carr also had certain confidentiality and non-solicitation obligations. (Ex. 6, Carr Agreement, at ¶¶ 1, 2).

29.     During their employment with the Select Parties or their affiliates, the Former Employees obtained certain confidential business information and trade secrets of the Select Parties or their affiliates, which included, but was not limited to, business plans, pricing data, customer lists, independent contractor lists, employee lists, supplier lists (including water sourcing), and technical processes and know-how.

30.     Effective March 31, 2017, the members of Crescent Companies, LLC ("Crescent Companies") closed the transaction (the "Rockwater Transaction") contemplated by that certain Contribution Agreement, by and among the Contributors and Rockwater Energy Solutions, Inc. (the "Rockwater Contribution Agreement"). At the

time of the Rockwater Transaction, Crescent Companies was the ultimate parent company of Plaintiff Crescent Services.

31.    As a result of the Rockwater Transaction, Rockwater Energy Solutions, LLC ("RES LLC") became the sole owner of Crescent Companies. At that time, RES LLC's ultimate parent company was Rockwater Energy Solutions, Inc. ("Rockwater").

32.    At the time of the Rockwater Transaction, Crescent Services existence did not change, and Crescent Services continued as a legal entity after the transaction. Crescent Services' membership interests continued to be held by Crescent Companies.

33.    The McDonald Employment Agreement, the Pack Employment Agreement, the Stover Employment Agreement, the McDonald Confidentiality and Assignment Agreement, and the Pack Confidentiality and Assignment Agreement were not terminated in connection with the Rockwater Transaction. McDonald, Pack, and Stover remained employees of Crescent Services following the Rockwater Transaction.

34.    Following the Rockwater Transaction, Stover was paid $50,000, which represented the Retention Bonus provided for in the Stover Employment Agreement at Paragraph 4.2.

35.    The payment of this $50,000 Retention Bonus in connection with the closing of the Rockwater Transaction satisfied all of Crescent Services' obligations to Stover with respect to the Retention Bonus and Paragraph 4.2 of the Stover Employment Agreement.

36.    Similar to all other officers and managers of Crescent Consulting and of Crescent Consulting's subsidiaries, effective March 31, 2017, Stover resigned as an

"officer or manager" of Crescent Services, but did <u>not</u> resign his employment with Crescent Services. Relevant to Stover's resignation, the Stover Employment Agreement did not guaranty Stover a particular office or title, but provided that Stover would serve in "such other position or positions with [Crescent Services] as directed or determined to be appropriate from time to time by [Crescent Services]." (Ex. 3, Stover Employment Agreement, at ¶ 2).

37.    As of March 31, 2017, Stover held 205,824 "Phantom Units" in Crescent Consulting, which were satisfied in full before the closing of the Rockwater Transaction.

38.    In connection with the Rockwater Transaction, Rockwater granted Stover 9,926 shares of restricted stock in Rockwater, pursuant to that certain Restricted Stock Agreement, by and among Rockwater and Stover, dated March 31, 2017 (the "<u>Rockwater Restricted Stock Agreement</u>"). This grant provided Stover with new incentive and retention compensation in place of the satisfied Retention Bonus.

39.    Effective April 30, 2017, McDonald and Crescent Services entered into that certain "2017 Amendment to Employment Agreement," which provided that "[e]xcept to the extent amended by this Agreement, [the McDonald Employment Agreement] will remain in full force and effect, unabated and uninterrupted." This amendment did not modify any of the restrictive covenants set forth in the McDonald Employment Agreement.

40.    On May 5, 2017, Stover and Crescent Services, entered into a letter agreement to amend the Stover Employment Agreement to modify Stover's salary and annual bonus compensation and to include new incentive compensation. The amendment

provided that the Stover Employment Agreement "remain[ed] in full force and effect, unabated and uninterrupted" except as modified by the amendment. The amendment did not modify any of the restrictive covenants set forth in the Stover Employment Agreement.

41.    On May 5, 2017, Stover executed that certain "Consent to Base Salary and Annual Bonus Structure," which contained substantially similar compensation modifications as set forth in the letter agreement referenced in the immediately preceding paragraph. This Consent also provided that "[a]ny written employment agreement between [Stover] and [Crescent Services] remain[ed] in full force and effect." The Consent did not modify any of the restrictive covenants set forth in the Stover Employment Agreement.

42.    Effective November 1, 2017, Rockwater and others completed a merger (the "Select Merger") with Select, pursuant to which Crescent Companies (and indirectly, Crescent Companies' wholly owned subsidiary, Crescent Services) became a wholly owned subsidiary of Select Energy Solutions (RW) LLC and its ultimate parent, Select. Rockwater also survived the Select Merger as a legal entity.

43.    Following the Select Merger, Crescent Services' existence did not change, and Crescent Services continued as a legal entity after the transaction. Crescent Services membership interests continued to be held by Crescent Companies.

44.    The Employment Agreements were not terminated in connection with the Select Merger.

45.    The Select Merger did not provide for a sale of assets by Crescent

Companies or Crescent Services.

46.     In connection with the Select Merger, Select granted Stover 7,595 shares of restricted stock in Select pursuant to the Restricted Stock Agreement (Rockwater Substitute Award), dated November 1, 2017 (the "Select Restricted Stock Agreement"). This grant provided Stover with new incentive and retention compensation in lieu of the Rockwater Restricted Stock Agreement.

47.     Following the Select Merger, no additional Retention Bonus was owed to Stover.

48.     Around the end of 2017 or shortly thereafter, while the Former Employees were still employed by the Select Parties, Select paid the Former Employees the annual bonuses and performance bonuses outlined in their respective Employment Agreements.

49.     In other words, Select honored the bonuses that were established by Crescent Services before the Select Merger, with the understanding among the Select Parties and the Former Employees that the Employment Agreements remained in force and effect between the Select Parties and the Former Employees.

50.     The Former Employees accepted and retained these bonuses.

51.     From November 2, 2011, to present, Crescent Services (and after the Select Merger, the Select Parties) has performed water-transfer services for Continental Resources, Inc. ("Continental") under that certain Master Service Contract (the "MSA"), dated November 2, 2011. From November 2, 2011, to present, Continental has been an established customer of the Select Parties.

52.     While he was employed by the Select Parties, Pack was the primary contact

for Continental's work in the Chickasha, Oklahoma area.

53.     In June 2018, Stover and Pack began to conspire to leave their employment with the Select Parties, taking Continental's business with them. Around that time, Stover informed Pack that he knew or had a relationship with Arty Straehla, the Chief Executive Officer of Mammoth.

54.     Shortly thereafter, while the Former Employees were still employed by the Select Parties, Stover contacted Arty Straehla to discuss the possibility of Stover and Pack leaving the Select Parties' employment to work for Mammoth. At that time, neither Mammoth nor any of its affiliates were providing water-transfer services in Oklahoma.

55.     In late June 2018, while the Former Employees were still employed by the Select Parties, Stover met with Arty Straehla to discuss Mammoth's plans in the water-transfer business. At that meeting, Straehla told Stover that Mammoth had a subsidiary, Stingray Energy Services, LLC ("Stingray"), which was trying to break into the water-transfer business in Ohio. But, Straehla also informed Stover that Stingray's start-up had been slow. Stover represented to Straehla that he had contacts in the Ohio area through which he could potentially grow Stingray's water-transfer business. Stover also said that he believed that he and Pack could deliver Continental's water-transfer business—which was then being performed by the Select Parties—to Mammoth.

56.     At that same meeting, which occurred while the Former Employees were still employed by the Select Parties, Stover also informed Straehla that he and Pack had executed Employment Agreements, which contained certain restrictive covenants. Stover agreed to provide Straehla these Employment Agreements (and any other agreements

13

with the Select Parties) for review by counsel.

57.     Upon information and belief, at the time of this meeting, Aquahawk's organic documents had not yet been filed with the Delaware Secretary of State: Division of Corporations and Aquahawk had not yet been registered to do business in Oklahoma with the Oklahoma Secretary of State.

58.     Following this meeting, while the Former Employees were still employed by the Select Parties, Stover called Pack to ask for a copy of Pack's Employment Agreement, which Pack provided to Stover.

59.     Thereafter, while the Former Employees were still employed by the Select Parties, Stover provided his and Pack's Employment Agreements and other agreements to Straehla for review.

60.     After additional conversations—including at least one conversation in which Mammoth's counsel advised Stover that he believed that the Employment Agreements were not enforceable and could and should be breached without concern— Mammoth offered Stover the position of Vice President of Operations of Aquahawk, with the understanding that Stover would deliver to Mammoth and Aquahawk Continental's water-transfer business in Oklahoma and additional water-transfer business in Ohio by soliciting Derrick Bennett to leave his employment with Select to become an employee of a Mammoth-owned entity.

61.     On or about June 28, 2018, Aquahawk's Certificate of Formation or other organic documents were filed with the Delaware Secretary of State: Division of Corporations. But, Aquahawk was not registered to do business in Oklahoma until

July 24, 2018.

62.    On or about July 2 or 3, 2018, Stover accepted the employment offer with Aquahawk. Around that same time, Stover informed his supervisor that he was leaving his employment with the Select Parties, effective July 6, 2018.

63.    On July 6, 2018, Stover informed his co-workers that that day was his last day of employment with the Select Parties.

64.    On the evening of July 6, 2018, Stover called Derrick Bennett, Director – Water Transfer for the Select Parties' Ohio operations, to inform Bennett that Stover had left his employment with the Select Parties. That weekend, Stover again called Bennett to inquire about the water-transfer business and available or interested water-transfer personnel in Ohio and to schedule a meeting with Bennett in Ohio on July 9.

65.    On the morning of July 9, 2018, Stover met with Pack for breakfast in Norman, Oklahoma. At that time, Stover informed Pack that he had accepted a position with Aquahawk. In turn, Pack asked Stover when he could expect to be hired by Aquahawk. Stover informed Pack that Aquahawk would post for the position. But, in the same timeframe, Stover arranged a job interview for Pack with Arty Straehla, Mammoth's CEO, on July 11, 2018. No other candidates were interviewed for Pack's position with Mammoth.

66.    On the afternoon of July 9, 2018, Stover travelled to Ohio. During this trip, Stover met with Derrick Bennett to solicit him to leave his employment with the Select Parties and to work for Mammoth, Aquahawk, or Stingray.

67.    On July 11, 2018, Pack interviewed with Arty Straehla, which Stover

15

attended. At the conclusion of the interview, Straehla offered Pack a job at Aquahawk, with a total compensation package greater than the total compensation package offered to and accepted by Stover, presumably because Pack's personal and business relationship with Chris Pease, a water transfer foreman with Continental, was essential to Aquahawk's poaching Continental's water-transfer business in Oklahoma from the Select Parties.

68.     Shortly thereafter, Pack accepted the offer to work for Aquahawk. During the week of July 16, 2018, Pack informed his supervisor, J.B. Shaw, that his last day with the Select Parties would be July 20, 2018. Around this same time, Pack informed McDonald that he would be leaving his employment with the Select Parties. Pack also gathered other Select Parties employees, including Marc Collier, Johnnie Ogletree, and Shawn Williams, to inform them that he was going to work for Aquahawk and that they could apply for positions through Mammoth's website.

69.     During that same week, while he was still employed by the Select Parties, Pack spoke with Chris Pease, Water Transfer Foreman for Continental, to discuss Pack's departure from the Select Parties and to solicit Continental's water-transfer business on behalf of Aquahawk.

70.     Further, in early July 2018, Pack and McDonald discussed their need to find an office for a new water-transfer business. Thereafter, McDonald located an office in Chickasha, Oklahoma, and Pack passed along the details about the office to Stover. Ultimately, Stover (on behalf of Aquahawk) negotiated and entered into a lease for this property. All of this occurred while Pack and McDonald were still employed by the

Select Entities.

71.     On July 23, 2018, Pack began working for Aquahawk at the Chickasha, Oklahoma office that McDonald found and Stover leased.

72.     On July 23, 2018, or shortly thereafter, Pack again spoke with Chris Pease to solicit Continental's water-transfer business in Oklahoma.

73.     On or about July 31, 2018, McDonald voluntarily terminated his employment with the Select Parties. McDonald began working for Aquahawk three days later.

74.     Around that same time, upon the Former Employees' solicitations, multiple additional Select Parties field employees servicing Continental left their employment with the Select Parties to work for Aquahawk.

75.     These solicitations included the solicitation of Kevin Carr, a Select Parties employee working out of the Select Parties' Springer, Oklahoma location, in the position of District Manager. Upon information and belief, Kevin Carr is currently employed by Aquahawk as a Water Transfer Manager.

76.     In January 2019, in addition to Kevin Carr, the Mammoth Parties also solicited and hired David Herrera and Tyler Meade from the Select Parties' Springer, Oklahoma location.

77.     As a result of the Mammoth Parties' conduct, the Select Parties have lost all of their business with Continental in Oklahoma.

78.     Since August 2018, Aquahawk has billed approximately $600,000 to $700,000 per month in revenue from performing water-transfer services for Continental

in Oklahoma.

79.     Additionally, upon information and belief, the Mammoth Parties have unlawfully solicited and hired Carr, Herrera, and Meade to poach the Select Parties' established customer XTO Energy, Inc.

80.     The Select Parties believe, in good faith, that the Former Employees fully intend to continue to violate the above paragraphs of their respective Employment Agreements to the detriment of the Select Parties.

81.     Further, the Select Parties believe, in good faith, that the Former Employees' conduct in violation of their agreements is a course of intended conduct to irreparably harm and destroy the Select Parties' reputation and relationships with their established customers and employees.

82.     Moreover, the Mammoth Parties' continued courting of the Select Parties' established customers and employees has repeatedly interfered with the Select Parties' business life, creating an atmosphere that discourages the Select Parties' customers from continuing to do business with the Select Parties and discourages the Select Parties' employees from continuing their employment with the Select Parties.

83.     This behavior evidences the real potential of causing irreparable damage to the Select Parties' business relationships with their established customers and employees.

## THEORIES OF RECOVERY

### Count 1
### (Breach of Contract against the Former Employees)

84.     The Select Parties incorporate the preceding paragraphs and further allege

as follows.

85.     The Select Parties have performed all of the terms and conditions under the Employment Agreements with the Defendants, even after the Select Merger. The Select Parties continued to honor the Former Employees' existing contracts, including agreed-upon bonuses, which the Former Employees accepted.

86.     By virtue of those same Employment Agreements with the Select Parties, the McDonald, Pack, and Stover have contractual obligations to not solicit business of any of the Select Parties' established customers.

87.     The Former Employees breached their duties and have directly solicited and done business with the Select Parties' established customers, including but not limited to Continental, in violation of their non-solicitation agreement.

88.     Additionally, by virtue of their non-solicitation agreements with the Select Parties, the Former Employees had a contractual obligation to not solicit current employees of the Select Parties.

89.     The Former Employees also breached their obligations under their agreements by directly and indirectly soliciting several of the Select Parties' employees, including, but not limited to, Stover's solicitation of Pack, Carr and Derrick Bennett, Stover's and Pack's solicitation of McDonald, and Carr's solicitation of David Herrera and Tyler Meade.

90.     Further, the Former Employees breached their obligations under their Employment Agreements, the Confidentiality and Assignment Agreements, and the Carr Agreement by disclosing to Mammoth and Aquahawk the Select Parties' confidential

information, including business plans, pricing data, customer lists, independent contractor lists, employee lists, supplier lists, and technical processes and know-how.

91.     As a result of the Former Employees' multiple breaches of their obligations under their agreements, the Select Parties have suffered and will continue to suffer damages, including, but not limited to, loss of employees, loss of established customers, loss of business value, loss of profits, and loss of goodwill, in an amount in excess of $75,000, which will be proven at trial.

### Count 2
### (Tortious Interference with Contract against Mammoth and Aquahawk)

92.     The Select Parties incorporate the preceding paragraphs and further allege as follows.

93.     As stated above, the Select Parties have certain contractual rights under the Employment Agreements, the Confidentiality and Assignment Agreements, and the MSA with Continental.

94.     Mammoth and Aquahawk interfered with these rights by, among other things, inducing the Former Employees to breach the restrictive covenants contained in the Employment Agreements, the Confidentiality and Assignment Agreements, and the Carr Agreement to unlawfully poach Continental's water-transfer business in Oklahoma and solicit the Select Parties' employees.

95.     Mammoth and Aquahawk's interference was malicious and wrongful, and such interference was not justified, privileged, or excusable.

96.     Mammoth's and Aqauhawk's interference caused the Select Parties

damages in excess of $75,000, which will be proven at trial.

97.     Mammoth and Aquahawk's conduct of soliciting established Select Parties customers and current employees, and engaging in anti-competitive conduct, constitutes tortious interference with contractual or business relationship.

98.     Mammoth and Aquahawk acted intentionally, maliciously, recklessly, or without regard to the rights of others, entitling the Select Parties to punitive damages.

**Count 3**
**(Tortious Interference with Prospective**
**Economic Advantage against the Mammoth Parties)**

99.     The Select Parties incorporate the preceding paragraphs and further allege as follows.

100.    Since at least November 2, 2011, to present, the Select Parties have had a business relationship and expectancy with Continental for the performance of water-transfer services.

101.    Through discussions with the Former Employees and otherwise, the Mammoth Parties knew of the Select Parties' business relationship and expectancy with Continental.

102.    By soliciting Continental during the term of their employment with the Select Parties and during the effective period of the non-solicitation covenants in the Employment Agreements, the Former Employees intentionally interfered with the Select Parties' relationship and expectancy with Continental.

103.    By inducing the Former Employees to solicit Continental during the term of their employment with the Select Parties and during the effective period of the non-

solicitation covenants in the Employment Agreements, Mammoth and Aquahawk intentionally interfered with the Select Parties' relationship and expectancy with Continental.

104.    Such interference was unfair, unlawful, or by lawful means without justification.

105.    As a result of the Mammoth Parties' interference, the Select Parties' relationship and expectancy with Continental was disrupted, causing damages in excess of $75,000, which will be proven at trial.

106.    The Mammoth Parties acted intentionally, maliciously, recklessly, or without regard to the rights of others, entitling the Select Parties to punitive damages.

**Count 4**
**(Breach of the Duty of Loyalty against the Former Employees)**

107.    The Select Parties incorporate the preceding paragraphs and further allege as follows.

108.    As the Select Parties' employees, the Former Employees owed the Select Parties a duty of loyalty.

109.    While they were employed by the Select Parties, the Former Employees breached their duty of loyalty by, among other things, conspiring to poach Continental's water-transfer work from the Select Parties, soliciting Continental's water-transfer business, soliciting the Select Parties' employees to leave their employment to go to work for Aquahawk, and preparing to compete with the Select Parties on company time and using company resources.

110.    As a result of the Former Employees' conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

111.    The Former Employees acted intentionally, maliciously, recklessly, or without regard to the rights of others, entitling the Select Parties to punitive damages.

**Count 5**
**(Tortious Inducement to Breach Fiduciary Duty against Mammoth and Aquahawk)**

112.    The Select Parties incorporate the preceding paragraphs and further allege as follows.

113.    Mammoth and Aquahawk colluded with the Former Employees in the Former Employees' breach of their duty of loyalty to the Select Parties.

114.    Mammoth and Aquahawk knowingly participated in or induced the Former Employees to breach their duty of loyalty.

115.    Mammoth and Aquahawk have knowingly accepted the benefits resulting from the Former Employees' breach, including billed revenues of $600,000 to $700,000 per month.

116.    As a result of Mammoth's and Aquahawk's conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

117.    Mammoth and Aquahawk acted intentionally, maliciously, recklessly, or without regard to the rights of others, entitling the Select Parties to punitive damages.

**Count 6**
**(Violation of the Defend Trade Secrets Act,**
**18 U.S.C. § 1836(b), against the Mammoth Parties)**

118.    The Select Parties incorporate the preceding paragraphs and further allege as follows.

119.    In the provision of water-transfer services, the Select Parties developed certain trade secrets, including business plans, pricing data, customer lists, independent contractor lists, employee lists, supplier lists, and technical processes and know-how.

120.    The Select Parties took reasonable measures to keep such information secret by, among other things, entering into the confidentiality covenants in the agreements with the Former Employees, limiting access to such information, password protecting such confidential information, and other similar protections.

121.    Such information possesses independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

122.    The Mammoth Parties acquired such information through the improper means of the Former Employees' breach of their duty of loyalty and contractual obligations to the Select Parties, which Mammoth and Aquahawk induced.

123.    The Mammoth Parties knew or had reason to know that such information was acquired by improper means.

124.    Such information was used in the provision of water-transfer services to national, publicly traded oil and gas companies for the production of oil and gas intended

for use in interstate commerce.

125.   As a result of the Mammoth Parties' conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

126.   The Mammoth Parties acted willfully and maliciously, entitling the Select Parties to attorney's fees and exemplary damages.

**Count 7**
**(Violation of the Oklahoma Uniform Trade Secrets Act,**
**78 O.S. §§ 85 *et seq.*, against the Mammoth Parties)**

127.   The Select Parties incorporate the preceding paragraphs and further allege as follows.

128.   In the provision of water-transfer services, the Select Parties developed certain trade secrets, including business plans, pricing data, customer lists, independent contractor lists, employee lists, supplier lists, and technical processes and know-how.

129.   The Select Parties took reasonable measures to keep such information secret by, among other things, entering into the confidentiality covenants in the Employment Agreements with the Former Employees, limiting access to such information, password protecting such confidential information, and other similar protections.

130.   Such information possesses independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

131.   The Mammoth Parties misappropriated such information through the

25

improper means of the Former Employees' breach of their duty of loyalty and contractual obligations to the Select Parties, which Mammoth and Aquahawk induced.

132.   The Mammoth Parties used the Select Parties' trade secrets to solicit and perform water-transfer services for Continental.

133.   As a result of the Mammoth Parties' conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

134.   The Mammoth Parties acted willfully and maliciously, entitling the Select Parties to attorney's fees and exemplary damages.

## Count 8
### (Misappropriation of Business Information against the Mammoth Parties)

135.   The Select Parties incorporate the preceding paragraphs and further allege as follows.

136.   For the purposes advancing their rival business interest, the Mammoth Parties procured the Select Parties' business information, including business plans, pricing data, customer lists, independent contractor lists, employee lists, supplier lists, and technical processes and know-how.

137.   The Mammoth Parties' procurement of such business information was made through the improper means of the Former Employees' breach of their duty of loyalty to the Select Parties, which Mammoth and Aquahawk induced.

138.   The Mammoth Parties possessed, disclosed, or used the Select Parties business information in the solicitation and performance water-transfer services for Continental.

139.   As a result of the Mammoth Parties' conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

140.   The Mammoth Parties acted intentionally, maliciously, and without just cause or excuse, entitling the Select Parties to punitive damages.

## Count 9
### (Unfair Competition against the Mammoth Parties)

141.   The Select Parties incorporate the preceding paragraphs and further allege as follows.

142.   The Select Parties and the Mammoth Parties are competitors.

143.   By engaging in the above-described conduct, the Mammoth Parties unfairly competed in bad faith with the Select Parties.

144.   As a result of the Mammoth Parties' conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

145.   The Mammoth Parties acted intentionally, maliciously, and without just cause or excuse, entitling the Select Parties to punitive damages.

## Count 10
### (Civil Conspiracy against the Mammoth Parties)

146.   The Select Parties incorporate the preceding paragraphs and further allege as follows.

147.   The Mammoth Parties conspired to unlawfully poach the Select Parties' water-transfer business with Continental.

148.   Through various meetings among the Mammoth Parties, the Mammoth Parties established a meeting of the minds on their object and course of action.

27

149.    The Mammoth Parties committed the unlawful, overt acts described in more detail above.

150.    As a result of the Mammoth Parties conduct, the Select Parties were damaged in an amount in excess of $75,000, which will be proven at trial.

**Count 11**
**(Temporary and Permanent Injunction against the Mammoth Parties)**

151.    The Mammoth Parties have breached and continue to breach enforceable agreements by violating the restrictive covenants in the Employment Agreements, the Confidentiality and Assignment Agreements, and the Carr Agreement or inducing the breach of those agreements. This conduct includes the solicitation of the Select Parties' established customers and the solicitation of multiple Select Parties employees to leave their employer and seek employment with Aquahawk. In addition to contractual breaches, for the reasons set out above, such conduct also violates state and federal law and is independently tortious.

152.    The Mammoth Parties' actions have caused harm the Select Parties, for which the Select Parties have a right to relief at trial.

153.    The Select Parties have reason to believe and do in fact believe that the Mammoth Parties have violated, and will continue to violate, their contractual, statutory, and common law obligations to the Select Parties. The Select Parties also have reason to believe and do in fact believe that the Mammoth Parties are improperly using the Select Parties' confidential information to the benefit of Mammoth, Aquahawk, and the Former Employees, to the disadvantage of the Select Parties.

154.    Therefore, in accordance with Federal Rule of Civil Procedure 65, the Select Parties are entitled to temporary and permanent injunctive relief, because the full nature and impact of the Mammoth Parties' conduct will ultimately have on the Select Parties is difficult, if not impossible, to discern.

155.    The Select Parties have been and will continue to be injured by the Mammoth Parties' unlawful actions in that the Select Parties' confidential information, goodwill, competitive advantage, and established client relationships will be jeopardized, lost, or permanently and irreparably damaged should the Mammoth Parties be permitted to continue such improper conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, premises considered, the Select Parties pray that the Court enter judgment in their favor, including actual damages; punitive damages; statutory exemplary damages; costs; attorney's fees; pre- and post-judgment interest; temporary and permanent injunctive relief, enjoining and restraining the Mammoth Parties from breaching, or inducing the breach of, the Employment Agreements, the Confidentiality and Assignment Agreements, and the Carr Agreement and otherwise injuring the Select Parties in the manner set out above; and such other and further relief that the Court deems appropriate.

Respectfully submitted,


/s/ Victor F. Albert_____
Victor F. Albert, OBA #12069
Brandon D. Kemp, OBA #31611
Kim Tran, OBA #21384
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
The Heritage Building
621 N. Robinson Ave., Ste. 400
Oklahoma City, OK 73102
(405) 546-3755 (Phone)
(405) 546-3775 (Fax)
victor.albert@ogletree.com
brandon.kemp@ogletree.com
kim.tran@ogletree.com

and

Kirk Olson, OBA #14571
Christensen Law
3401 N.W. 63rd Street, Suite 611
The Parkway Building
Oklahoma City, OK  73116-3707
Phone: (405) 239-2121
Fax:  (405) 236-1012
Kirk@christensen.law
**Attorneys for the Select Parties**


36875061.1


37006710.1